(Slip Opinion) OCTOBER TERM, 2009 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## DILLON *v.* UNITED STATES

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

No. 09–6338.   Argued March 30, 2010—Decided June 17, 2010

In 1993, petitioner Dillon was convicted of, *inter alia*, crack and powder cocaine offenses, which produced a base offense level of 38 and a Guidelines range of 262-to-327 months' imprisonment. The court sentenced him at the bottom of the range for those counts. After the Sentencing Commission amended the Guidelines to reduce the base offense level associated with each quantity of crack cocaine, USSG Supp. App. C, Amdt. 706, and made that amendment retroactive, USSG Supp. App. C, Amdt. 713, Dillon moved for a sentence reduction under 18 U. S. C. §3582(c)(2). That provision authorizes a district court to reduce an otherwise final sentence pursuant to a Guidelines amendment if a reduction is consistent with the Commission's policy statements. The relevant policy statement, USSG §1B1.10, precludes a court from reducing a sentence "to a term that is less than the minimum of the amended guidelines range" except in limited circumstances. In addition to the two-level reduction authorized by the amendment, Dillon sought a variance below the amended Guidelines range, contending that *United States* v. *Booker*, 543 U. S. 220, authorized the exercise of such discretion. The District Court imposed a sentence at the bottom of the revised range but declined to grant a further reduction. Finding *Booker* inapplicable to §3582(c)(2) proceedings, the court concluded that the Commission's directives in §1B1.10 constrained it to impose a sentence within the amended Guidelines range. The Third Circuit affirmed.

*Held: Booker*'s holdings do not apply to §3582(c)(2) proceedings and therefore do not require treating §1B1.10(b) as advisory. Pp. 6–14.

(a) The statute's text and narrow scope belie Dillon's characterization of proceedings under §3582(c)(2) as "resentencing" proceedings governed by the same principles as other sentencing proceedings. In-

stead, §3582(c)(2) authorizes only a limited adjustment to an otherwise final sentence. This conclusion is further supported by the substantial role Congress gave the Commission with respect to sentence-modification proceedings, charging it with determining whether and to what extent a Guidelines amendment will be retroactive, 28 U. S. C. §994(u), and authorizing a court to grant a reduction under §3582(c)(2) only "if [it] is consistent with applicable policy statements issued by the Sentencing Commission." Section 3582(c)(2) establishes a two-step inquiry: A court must (1) determine the scope of the reduction, if any, authorized by §1B1.10, and then (2) consider whether the authorized reduction is warranted according to the applicable §3553(a) factors. At step one, the court must follow the Commission's instructions in §1B1.10 to impose a term of imprisonment within the amended Guidelines range unless the sentencing court originally imposed a below-Guidelines sentence. §1B1.10(b)(2). Because reference to §3553(a) is appropriate only at step two, that provision does not transform §3582(c)(2) proceedings into plenary resentencing proceedings. Pp. 6–10.

(b) Given §3582(c)(2)'s limited scope and purpose, proceedings under that section do not implicate *Booker*. The section represents a congressional act of lenity intended to give prisoners the benefit of later enacted adjustments to the judgments reflected in the Guidelines. Taking the original sentence as given, any facts found by a judge at a §3582(c)(2) proceeding do not serve to increase the prescribed range of punishment; instead, they affect only the judge's exercise of discretion within that range. That exercise does not contravene the Sixth Amendment, even if it is informed by judge-found facts. *Apprendi* v. *New Jersey*, 530 U. S. 466, 481. Thus, Dillon's Sixth Amendment rights were not violated by the District Court's adherence to §1B1.10's instruction to consider a reduction only within the amended Guidelines range. Dillon's argument that *Booker*'s remedial opinion nonetheless requires the Guidelines to be treated as advisory in such proceedings is unpersuasive given that proceedings under §3582(c)(2) are readily distinguishable from other sentencing proceedings. Pp. 10–13.

(c) Also rejected is Dillon's argument that the District Court should have corrected other mistakes in his original sentence, namely, a *Booker* error resulting from the initial sentencing court's treatment of the Guidelines as mandatory and an alleged error in the calculation of his criminal-history category. Because those aspects of Dillon's sentence were not affected by the crack-cocaine Guidelines amendment, they are outside the scope of the §3582(c)(2) proceeding, and the District Court properly declined to address them. Pp. 13–14.

572 F. 3d 146, affirmed.

Syllabus

SOTOMAYOR, J., delivered the opinion of the Court, in which ROBERTS, C. J., and SCALIA, KENNEDY, THOMAS, GINSBURG, and BREYER, JJ., joined. STEVENS, J., filed a dissenting opinion. ALITO, J., took no part in the decision of the case.

NOTICE: This opinion is subject to formal revision before publication in the
preliminary print of the United States Reports. Readers are requested to
notify the Reporter of Decisions, Supreme Court of the United States, Wash-
ington, D. C. 20543, of any typographical or other formal errors, in order
that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 09–6338

## PERCY DILLON, PETITIONER *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE THIRD CIRCUIT

[June 17, 2010]

JUSTICE SOTOMAYOR delivered the opinion of the Court.

A federal court generally "may not modify a term of imprisonment once it has been imposed." 18 U. S. C. §3582(c). Congress has provided an exception to that rule "in the case of a defendant who has been sentenced to a term of imprisonment based on a sentencing range that has subsequently been lowered by the Sentencing Commission." §3582(c)(2). In those circumstances, §3582(c)(2) authorizes a court to reduce the term of imprisonment "if such a reduction is consistent with" applicable Commission policy statements. The policy statement governing §3582(c)(2) proceedings instructs courts not to reduce a term of imprisonment below the minimum of an amended sentencing range except to the extent the original term of imprisonment was below the range then applicable. See United States Sentencing Commission, Guidelines Manual §1B1.10(b)(2) (Nov. 2009) (USSG). This case presents the question whether our decision in *United States* v. *Booker*, 543 U. S. 220 (2005), which rendered the Guidelines advisory to remedy the Sixth Amendment problems associated with a mandatory sentencing regime, requires treating §1B1.10(b) as nonbinding. We conclude that *Booker* does

not demand that result.

I

The Sentencing Reform Act of 1984 (SRA or Act), 98 Stat. 1987, established the Sentencing Commission and authorized it to promulgate Sentencing Guidelines and to issue policy statements regarding the Guidelines' application. See 28 U. S. C. §§991, 994(a). The Act also charged the Commission with periodically reviewing and revising the Guidelines. See §994(*o*). When a revision reduces the Guidelines range for a given offense, the Commission must determine "in what circumstances and by what amount the sentences of prisoners serving terms of imprisonment for the offense may be reduced." §994(u).

As enacted, the SRA made the Sentencing Guidelines binding. See *Booker*, 543 U. S., at 233–234. Except in limited circumstances, district courts lacked discretion to depart from the Guidelines range. See *Burns* v. *United States*, 501 U. S. 129, 133 (1991). Under that regime, facts found by a judge by a preponderance of the evidence often increased the mandatory Guidelines range and permitted the judge to impose a sentence greater than that supported by the facts established by the jury verdict or guilty plea. See *Booker*, 543 U. S., at 235. We held in *Booker* that treating the Guidelines as mandatory in these circumstances violated the Sixth Amendment right of criminal defendants to be tried by a jury and to have every element of an offense proved by the Government beyond a reasonable doubt. *Id.*, at 243–244.

To remedy the constitutional problem, we rendered the Guidelines advisory by invalidating two provisions of the SRA: 18 U. S. C. §3553(b)(1) (2000 ed., Supp. IV), which generally required a sentencing court to impose a sentence within the applicable Guidelines range, and §3742(e) (2000 ed. and Supp. IV), which prescribed the standard of review on appeal, including *de novo* review of Guidelines

departures. 543 U. S., at 259. "With these two sections excised (and statutory cross-references to the two sections consequently invalidated)," we held that "the remainder of the Act satisfies the Court's constitutional requirements." *Ibid. Booker* thus left intact other provisions of the SRA, including those giving the Commission authority to revise the Guidelines, 28 U. S. C. §994(*o*) (2006 ed.), and to determine when and to what extent a revision will be retroactive, §994(u).

With respect to drug-trafficking offenses, the Sentencing Guidelines establish a defendant's base offense level according to the type and weight of the drug. See USSG §§2D1.1(a), (c). When the Commission first promulgated the Guidelines in 1987, it adopted the 100-to-1 ratio selected by Congress in setting mandatory minimum sentences in the Anti-Drug Abuse Act of 1986, 100 Stat. 3207. Under that framework, the Commission "treated every gram of crack cocaine as the equivalent of 100 grams of powder cocaine." *Kimbrough* v. *United States*, 552 U. S. 85, 96 (2007). The Commission later sought to alleviate the disparity produced by this ratio. After several failed attempts at reform, see *id.*, at 99, the Commission in 2007 amended the Guidelines to reduce by two levels the base offense level associated with each quantity of crack cocaine. See USSG Supp. App. C, Amdt. 706 (effective Nov. 1, 2007). In 2008, the Commission made that amendment retroactive. See *id.*, Amdt. 713 (effective Mar. 3, 2008).

When the Commission makes a Guidelines amendment retroactive, 18 U. S. C. §3582(c)(2) authorizes a district court to reduce an otherwise final sentence that is based on the amended provision. Any reduction must be consistent with applicable policy statements issued by the Sentencing Commission. The relevant policy statement, USSG §1B1.10, instructs courts proceeding under §3582(c)(2) to substitute the amended Guidelines range while "leav[ing] all other guideline application decisions

unaffected." §1B1.10(b)(1).[1]  Under §3582(c)(2), a court may then grant a reduction within the amended Guidelines range if it determines that one is warranted "after considering the factors set forth in section 3553(a) to the extent that they are applicable."[2]  Except in limited circumstances, however, §1B1.10(b)(2)(A) forecloses a court acting under §3582(c)(2) from reducing a sentence "to a term that is less than the minimum of the amended guideline range."

## II

A jury convicted petitioner Percy Dillon in 1993 of conspiracy to distribute and to possess with the intent to distribute more than 500 grams of powder cocaine and more than 50 grams of crack cocaine in violation of 21 U. S. C. §846, possession with the intent to distribute more than 500 grams of powder cocaine in violation of §841(a)(1), and use of a firearm during and in relation to a drug-trafficking offense in violation of 18 U. S. C. §924(c)(1).  Dillon's convictions exposed him to a statutory sentencing range of 10 years to life for the conspiracy, 5-to-40 years for cocaine possession, and a mandatory minimum sentence of 5 years for the firearm offense, to be served consecutively to the sentence for the drug offenses.

————————

[1] The Sentencing Commission substantially revised §1B1.10 in March 2008, see USSG Supp. App. C, Amdt. 712 (Nov. 2009) (effective Mar. 3, 2008), roughly three months before the District Court's decision in this case.  Because the current version of the relevant Guidelines provisions is not meaningfully different from the version in effect at the time of the District Court's decision, references in this opinion are to the current, 2009 edition of the Guidelines.

[2] Section 3553(a) provides that a "court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection," and it enumerates several factors a court "shall consider" in determining an appropriate sentence, including "the nature and circumstances of the offense and the history and characteristics of the defendant," §3553(a)(1).

At sentencing, the District Court made additional findings of fact and concluded that Dillon was responsible for 1.5 kilograms of crack and 1.6 kilograms of powder cocaine. Under USSG §2D1.1, those drug quantities produced a base offense level of 38. After offsetting adjustments for acceptance of responsibility, §3E1.1, and reckless endangerment during flight, §3C1.2, Dillon's total offense level remained 38. Coupled with a criminal-history category of II,[3] that offense level produced a then-mandatory Guidelines range of 262-to-327 months' imprisonment for the drug counts.

The court sentenced Dillon at the bottom of the Guidelines range for those counts, followed by a mandatory 60-month sentence for the firearm count, for a total sentence of 322 months' imprisonment. At Dillon's sentencing, the court described the term of imprisonment as "entirely too high for the crime [Dillon] committed." App. 13. Perceiving no basis for departing from the then-mandatory Sentencing Guidelines, the District Court felt constrained to impose a sentence within the prescribed range. The Court of Appeals for the Third Circuit affirmed Dillon's convictions and sentence on appeal. See 100 F. 3d 949 (1996).

After the Sentencing Commission made the amendment to the crack-cocaine Guidelines retroactive in 2008, Dillon filed a *pro se* motion for a sentence reduction pursuant to §3582(c)(2). In the motion, Dillon asked the court to grant not just the two-level reduction authorized by the amendment but also a further reduction consistent with the sentencing factors found in §3553(a). Based largely on his postsentencing conduct, including his determined pursuit of educational and community-outreach opportunities,

---

[3] The Probation Office based Dillon's criminal-history assessment on two prior misdemeanor convictions, one for possession of marijuana and one for resisting arrest. Dillon did not object to that calculation of his criminal-history score.

Dillon contended that a variance from the amended Guidelines range was warranted in his case. He further urged that, after *Booker*, the court was authorized to grant such a variance because the amended Guidelines range was advisory notwithstanding any contrary statement in §1B1.10.

The District Court reduced Dillon's sentence to 270 months—the term at the bottom of the revised Guidelines range.[4] But the court declined to go further. Concluding that the sentencing proceedings at issue in *Booker* are readily distinguishable from those under §3582(c)(2), the court found *Booker*'s holdings inapplicable to the instant proceeding and accordingly held that it lacked authority to impose a sentence inconsistent with §1B1.10.

The Third Circuit affirmed. 572 F. 3d 146, 150 (2009). The court noted that §3582(c)(2) is codified in a different section than the provisions invalidated in *Booker* and contains no cross-reference to those provisions. Finding no other indication that *Booker* "obviate[d] the congressional directive in §3582(c)(2) that a sentence reduction pursuant to that section be consistent with Sentencing Commission policy statements," 572 F. 3d, at 149, the Third Circuit held that §1B1.10 is binding. It therefore agreed that the District Court lacked authority to reduce Dillon's sentence below the amended Guidelines range.

We granted certiorari to consider *Booker*'s applicability to §3582(c)(2) proceedings. 558 U. S. ___ (2009).

## III
### A

"[A] judgment of conviction that includes [a sentence of imprisonment] constitutes a final judgment" and may not be modified by a district court except in limited circum-

---

[4] The revised sentence reflects a 210-month term of imprisonment for the narcotics offenses and a mandatory, consecutive 60-month term for the firearm offense.

stances. §3582(b). Section 3582(c)(2) establishes an exception to the general rule of finality "in the case of a defendant who has been sentenced to a term of imprisonment based on a sentencing range that has subsequently been lowered by the Sentencing Commission pursuant to 28 U. S. C. §994(*o*)" and made retroactive pursuant to §994(u). In such cases, Congress has authorized courts to "reduce the term of imprisonment, after considering the factors set forth in section 3553(a) to the extent that they are applicable, if such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." §3582(c)(2).

Characterizing proceedings under §3582(c)(2) as "resentencing" proceedings, Dillon contends that "[t]here is no practical or functional difference between a resentencing pursuant to §3582(c)(2) and any other resentencing." Brief for Petitioner 18. Accordingly, Dillon urges, the same principles that govern other sentencing proceedings likewise govern §3582(c)(2) proceedings, and courts have authority under §3582(c)(2) to vary from the revised Guidelines range consistent with §3553(a), see *Kimbrough*, 552 U. S., at 101. Dillon cites as support for this view §3582(c)(2)'s instruction to consider the factors in §3553(a) in determining whether a sentence reduction is warranted. Under Dillon's approach, *Booker* would preclude the Commission from issuing a policy statement that generally forecloses below-Guidelines sentences at §3582(c)(2) proceedings, as USSG §1B1.10 purports to do. Dillon thus asks us to excise the mandatory language of §1B1.10(b)(2)(A) and treat that provision as advisory, just as we did the offending statutory provisions in *Booker*.

The language of §3582(c)(2) belies Dillon's characterization of proceedings under that section. By its terms, §3582(c)(2) does not authorize a sentencing or resentencing proceeding. Instead, it provides for the "modif[ication of] a term of imprisonment" by giving courts the power to

"reduce" an otherwise final sentence in circumstances specified by the Commission. Compare 28 U. S. C. §994(a)(2)(C) (referring to §3582(c)(2) as a "sentence modification provisio[n]"), with 18 U. S. C. §3742(f) (authorizing courts of appeals to remand "for further sentencing" upon a finding of error), and §3742(g) (establishing the terms of "sentencing upon remand" and describing the proceeding as a "resentenc[ing]" (capitalization omitted)). It is also notable that the provision applies only to a limited class of prisoners—namely, those whose sentence was based on a sentencing range subsequently lowered by the Commission. Section 3582(c)(2)'s text, together with its narrow scope, shows that Congress intended to authorize only a limited adjustment to an otherwise final sentence and not a plenary resentencing proceeding.

The substantial role Congress gave the Commission with respect to sentence-modification proceedings further supports this conclusion. The SRA charges the Commission both with deciding whether to amend the Guidelines, §994(*o*), and with determining whether and to what extent an amendment will be retroactive, §994(u).[5] A court's power under §3582(c)(2) thus depends in the first instance on the Commission's decision not just to amend the Guidelines but to make the amendment retroactive. The court is also constrained by the Commission's statements dictating "by what amount" the sentence of a prisoner serving a term of imprisonment affected by the amendment "may be reduced." §994(u); see also *Braxton* v. *United States*, 500 U. S. 344, 348 (1991) (noting that the Commission implemented that power through §1B1.10).

Read in this context, §3582(c)(2)'s reference to §3553(a)

--------

[5] We do not respond to the dissent's separation-of-powers discussion, see *post*, at 11–16 (opinion of STEVENS, J.), as that issue is not fairly encompassed within the questions presented and was not briefed by the parties.

does not undermine our narrow view of proceedings under the former provision. Section 3582(c)(2) instructs a district court to "conside[r] the factors set forth in section 3553(a) to the extent that they are applicable," but it authorizes a reduction on that basis only "if such a reduction is consistent with applicable policy statements issued by the Sentencing Commission"—namely, §1B1.10. The statute thus establishes a two-step inquiry. A court must first determine that a reduction is consistent with §1B1.10 before it may consider whether the authorized reduction is warranted, either in whole or in part, according to the factors set forth in §3553(a).

Following this two-step approach, a district court proceeding under §3582(c)(2) does not impose a new sentence in the usual sense. At step one, §3582(c)(2) requires the court to follow the Commission's instructions in §1B1.10 to determine the prisoner's eligibility for a sentence modification and the extent of the reduction authorized. Specifically, §1B1.10(b)(1) requires the court to begin by "determin[ing] the amended guideline range that would have been applicable to the defendant" had the relevant amendment been in effect at the time of the initial sentencing. "In making such determination, the court shall substitute only the amendments listed in subsection (c) for the corresponding guideline provisions that were applied when the defendant was sentenced and shall leave all other guideline application decisions unaffected." *Ibid.*

Consistent with the limited nature of §3582(c)(2) proceedings, §1B1.10(b)(2) also confines the extent of the reduction authorized. Courts generally may "not reduce the defendant's term of imprisonment under 18 U. S. C. §3582(c)(2) . . . to a term that is less than the minimum of the amended guideline range" produced by the substitution. §1B1.10(b)(2)(A). Only if the sentencing court originally imposed a term of imprisonment below the Guidelines range does §1B1.10 authorize a court proceeding

under §3582(c)(2) to impose a term "comparably" below the amended range. §1B1.10(b)(2)(B).

At step two of the inquiry, §3582(c)(2) instructs a court to consider any applicable §3553(a) factors and determine whether, in its discretion, the reduction authorized by reference to the policies relevant at step one is warranted in whole or in part under the particular circumstances of the case. Because reference to §3553(a) is appropriate only at the second step of this circumscribed inquiry, it cannot serve to transform the proceedings under §3582(c)(2) into plenary resentencing proceedings.

This understanding of §3582(c)(2) as a narrow exception to the rule of finality finds further support outside the statute. Federal Rule of Criminal Procedure 43 requires that a defendant be present at "sentencing," see Rule 43(a)(3), but it excludes from that requirement proceedings that "involv[e] the correction or reduction of sentence under Rule 35 or 18 U. S. C. §3582(c)," Rule 43(b)(4). Like §3582(c)(2), Rule 35 delineates a limited set of circumstances in which a sentence may be corrected or reduced. Specifically, it authorizes a court to "correct a sentence that resulted from arithmetical, technical, or other clear error" within 14 days after sentencing, Rule 35(a), and it authorizes a reduction for substantial assistance on the Government's motion, Rule 35(b). Rule 43 therefore sets the proceedings authorized by §3582(c)(2) and Rule 35 apart from other sentencing proceedings.

B

Given the limited scope and purpose of §3582(c)(2), we conclude that proceedings under that section do not implicate the interests identified in *Booker*. Notably, the sentence-modification proceedings authorized by §3582(c)(2) are not constitutionally compelled. We are aware of no constitutional requirement of retroactivity that entitles defendants sentenced to a term of imprisonment to the

benefit of subsequent Guidelines amendments. Rather, §3582(c)(2) represents a congressional act of lenity intended to give prisoners the benefit of later enacted adjustments to the judgments reflected in the Guidelines.

Viewed that way, proceedings under §3582(c)(2) do not implicate the Sixth Amendment right to have essential facts found by a jury beyond a reasonable doubt. Taking the original sentence as given, any facts found by a judge at a §3582(c)(2) proceeding do not serve to increase the prescribed range of punishment; instead, they affect only the judge's exercise of discretion within that range. "[J]udges in this country have long exercised discretion of this nature in imposing sentence *within [established] limits* in the individual case," and the exercise of such discretion does not contravene the Sixth Amendment even if it is informed by judge-found facts. *Apprendi* v. *New Jersey*, 530 U. S. 466, 481 (2000) (emphasis in original). Because §3582(c)(2) proceedings give judges no more than this circumscribed discretion, "[t]here is no encroachment here by the judge upon facts historically found by the jury, nor any threat to the jury's domain as a bulwark at trial between the State and the accused." *Oregon* v. *Ice*, 555 U. S. ___, ___ (2009) (slip op., at 8). Accordingly, Dillon's Sixth Amendment rights were not violated by the District Court's adherence to the instruction in §1B1.10 to consider a reduction only within the amended Guidelines range.

Dillon contends that, even if §3582(c)(2) does not implicate the constitutional rights vindicated in *Booker*—something the dissent appears to concede—the remedial aspect of the Court's decision applies to proceedings under that section and requires that the Guidelines be treated as advisory in such proceedings just as they are in other sentencing proceedings. In support of his position, Dillon invokes the Ninth Circuit's reasoning in *United States* v.

*Hicks*, 472 F. 3d 1167, 1170 (2007).[6]  Relying on our rejec-
tion in *Booker* of a remedy that would have made the
Guidelines advisory only in certain cases—namely, when
treating them as binding would run afoul of the Sixth
Amendment, see 543 U. S., at 265–267—the Ninth Circuit
held that *Booker* precludes treating the Guidelines as
mandatory for purposes of §3582(c)(2) and advisory in
other contexts, see *Hicks*, 472 F. 3d, at 1171–1172.

   This argument is unpersuasive.  The incomplete remedy
we rejected in *Booker* would have required courts to treat
the Guidelines differently in similar proceedings, leading
potentially to unfair results and considerable administra-
tive challenges.  See 543 U. S., at 266.  As already ex-
plained, the sentence-modification proceedings authorized
by §3582(c)(2) are readily distinguishable from other
sentencing proceedings.  Given the substantially different
purpose of §3582(c)(2) and the circumscribed nature of
proceedings under that section, requiring courts to honor
§1B1.10(b)(2)'s instruction not to depart from the amended
Guidelines range at such proceedings will create none of
the confusion or unfairness that led us in *Booker* to reject
the Government's argument for a partial fix.

   The dissent's contrary conclusion rests on two erroneous
premises.  First, the dissent ignores the fundamental
differences between sentencing and sentence-modification
proceedings   and   asserts   without   explanation   that
"[n]othing turns on" the distinction between them.  *Post*,
at 11.  For the reasons stated above, the statutory differ-
ences  between  the  proceedings  are  highly  significant.

   Second, the dissent gives short shrift to the fact that,
after *Booker*, the Commission retains at least some au-

––––––––

   [6] The Ninth Circuit subsequently agreed to consider en banc *Booker*'s
applicability to §3582(c)(2) proceedings.  See *United States* v. *Fox*, 583
F. 3d 596 (2009).  The matter was stayed pending our decision in this
case.  No. 08–30445 (CA9, Dec. 8, 2009).

thority to bind the courts. Through §994(u), Congress charged the Commission with determining "in what circumstances and by what amount" the sentences of prisoners affected by Guidelines amendments "may be reduced." No one disputes that the Commission's retroactivity determinations made pursuant to the first part of that authorization are binding. See *post*, at 17, and n. 8. This aspect of the Commission's power emphatically undermines the dissent's insistence that the Guidelines after *Booker* are "completely advisory." *Post*, at 9. Moreover, while the dissent criticizes our approach for leaving the Commission with only the "the tiniest sliver of lawmaking power," *post*, at 11, the dissent would leave the Commission with an even smaller and less explicable sliver by dissecting the authority granted by §994(u).

For all of these reasons, we conclude that neither *Booker*'s constitutional nor remedial holding requires the result that Dillon urges.

IV

Dillon additionally contends that the District Court erred in failing to correct two mistakes in his original sentence. Under his view of §3582(c)(2), a district court is required to recalculate a defendant's sentence. Thus, any mistakes committed at the initial sentencing are imposed anew if they are not corrected. According to Dillon, the District Court in the instant proceeding should have corrected the *Booker* error that resulted from the initial sentencing court's treatment of the Guidelines as mandatory, and it should have adjusted his criminal-history category, which he now contends was erroneously inflated.

Dillon's arguments in this regard are premised on the same misunderstanding of the scope of §3582(c)(2) proceedings dispelled above. As noted, §3582(c)(2) does not authorize a resentencing. Instead, it permits a sentence reduction within the narrow bounds established by the

Commission. The relevant policy statement instructs that a court proceeding under §3582(c)(2) "shall substitute" the amended Guidelines range for the initial range "and shall leave all other guideline application decisions unaffected." §1B1.10(b)(1). Because the aspects of his sentence that Dillon seeks to correct were not affected by the Commission's amendment to §2D1.1, they are outside the scope of the proceeding authorized by §3582(c)(2), and the District Court properly declined to address them.

\*     \*     \*

For the foregoing reasons, the judgment of the Court of Appeals is

*Affirmed.*

JUSTICE ALITO took no part in the decision of this case.

# SUPREME COURT OF THE UNITED STATES

———————

No. 09–6338

———————

## PERCY DILLON, PETITIONER *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE THIRD CIRCUIT

[June 17, 2010]

JUSTICE STEVENS, dissenting.

When sentencing petitioner Percy Dillon for crack co-caine-related offenses in 1993, the District Court stated that the punishment Dillon received was "entirely too high for the crime [he] committed." App. 13. Bound by a sen-tencing regime that was mandatory at the time, the judge had no choice but to sentence Dillon to 322 months of imprisonment—nearly 27 years behind bars. The judge later explained that, were it within his discretion, he would have sentenced Dillon to 5 years of imprisonment. *Id.*, at 62. Had Dillon been sentenced after our decision in *United States* v. *Booker*, 543 U. S. 220 (2005), the judge would have had that discretion. Instead, the District Court was compelled to mete out a punishment that it believed to be grossly disproportionate to the offense and, therefore, "greater than necessary" to meet the goals of our criminal justice system, 18 U. S. C. §3553(a).

The punishment Dillon received was so high, in part, because at the time of his conviction our drug laws pun-ished crack cocaine offenses 100 times more severely than powder cocaine offenses. In 2007, as the Court explains, see *ante*, at 3, the United States Sentencing Commission (Commission) proposed a partial fix to this disparity, lowering its Guidelines Manual[1] ranges for crack cocaine

———————

[1] The Guidelines Manual itself contains two types of provisions:

offenses to a 20:1 ratio. See United States Sentencing Commission, Guidelines Manual Supp. App. C, Amdt. 706 (Nov. 2009) (USSG) (effective Nov. 1, 2007). Pursuant to its congressional mandate, see 28 U. S. C. §994(u), the Commission made this change retroactive for those individuals, like Dillon, who were still serving sentences for crack cocaine offenses. See USSG Supp. App. C, Amdt. 713 (effective Mar. 3, 2008).

Although Dillon does not have a constitutional right to obtain the benefit of the Commission's change, it is undisputed that he has a statutory right to do so. Under 18 U. S. C. §3582(c)(2), a federal prisoner "who has been sentenced to a term of imprisonment based on a sentencing range that has subsequently been lowered" by the Commission may seek a sentence reduction, but only after the court "consider[s] the factors set forth in section 3553(a)," and only "if such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." Dillon sought such relief. His 322-month sentence was reduced to a 270-month sentence—still 17½ years more than the sentencing judge thought necessary as an initial matter.

In his §3582(c)(2) proceeding, Dillon alleged that his circumstances warranted an additional reduction in light of the fact that his sentence was "greater than necessary" to effectuate the goals of our sentencing system, §3553(a). He also emphasized that he has been a model inmate during his 17 years in federal prison. Once again, however, the District Court felt that its hands were tied, this

_____

guidelines, see 28 U. S. C. §994(a)(1), and policy statements, see §944(a)(2). I use "Guidelines" in this opinion to refer to both the guidelines as described in §994(a)(1), as well as more generally to all of the provisions in the Guidelines Manual. The section numbers of both types of provisions are enumerated identically within the Commission's Guidelines Manual, but their effects, as discussed in more detail herein, are different.

time because USSG §1B1.10(b)(2) purports to place a mandatory limit on the extent of any sentence reduction that a court may order pursuant to §3582(c)(2). And so, giving the Commission's statement the effect of law, the District Court denied Dillon further relief.

Today, the Court holds that in this one limited nook of sentencing law, the Commission retains the power to bind judges that we struck down in *Booker*. In my view, the Court's decision to treat the Commission's policy statement as a mandatory command rather than an advisory recommendation is unfaithful to *Booker*. It is also on dubious constitutional footing, as it permits the Commission to exercise a barely constrained form of lawmaking authority. And it is manifestly unjust. I would therefore hold that in the context of a §3582(c)(2) sentence modification proceeding, the District Court may consider, but is not bound by, any applicable policy statements promulgated by the Commission. In other words, I would apply *Booker*'s remedial holding to §3582(c)(2) proceedings.

## I

Although I did not join JUSTICE BREYER's remedial opinion for the Court in *Booker*, it is nevertheless clear to me that its scope applies to §3582(c)(2) proceedings.

As an initial matter, it is of no moment that the *Booker* Court did not excise any portion of §3582 when crafting its remedy. At the time, there was nothing in §3582(c)(2)— separate and apart from the Guidelines' general mandatory nature—that would have limited the District Court's discretion in a §3582(c)(2) proceeding. There was, consequently, nothing that needed excising. Relief under §3582(c)(2) is available if it is "consistent with" the Commission's related policy statement. And when we decided *Booker*, the particular policy statement at issue,

§1B1.10(b), had no explicit binding effect.[2]

Prior to our decision in *Booker*, the Guidelines were mandatory only by virtue of congressional mandate, and not by virtue of Commission decree. See 18 U. S. C. §3553(b)(1). Following *Booker*, the Commission's policy statement in §1B1.10 took effect in March 2008. That statement, I will explain more fully in Part II, *infra*, is now the only source of binding authority in §3582(c)(2) proceedings, as it purports to have the effect of reinstating a mandatory Guidelines regime within the context of a sentence modification proceeding. It is now the Commission's *policy statement*, and not an explicit congressional mandate, that makes the Guidelines ranges binding under §3582(c)(2).

As a matter of textual analysis, divorced from judicial precedent, it is certainly reasonable for the Court to find that the Commission can set mandatory limits on sentence reductions under §3582(c)(2). But it is a mistake, in my view, to take such a narrow approach to the question presented by this case. The Court has turned a blind eye to the fundamental sea-change that was our decision in *Booker*.

---

[2] From 1989 to 1994, the policy statement in §1B1.10 also contained what could be described fairly as a limitation on the "amount" of an available sentence reduction. See USSG §1B1.10(c)(2) (Nov. 1990) ("[A] reduction in a defendant's term of imprisonment . . . may, in no event, exceed the number of months by which the maximum of the guideline range applicable to the defendant . . . has been lowered"). In 1994, as part of Amendment 504 to the Guidelines Manual, the Commission deleted this provision, explaining that this "rather complex subsection" was an "unnecessary restriction on the court's consideration of a revised sentence." USSG, App. C, Amdt. 504 (effective Nov. 1, 1994). Later, in an "Application Note," the Commission indicated that "the amended guideline range" "limit[s] the extent to which an eligible defendant's sentence may be reduced." *Id.*, Amdt. 548 (effective Nov. 1, 1997). The bottom line is that it was the Guidelines' mandatory nature, and not the effect of a policy statement, that made the Guidelines ranges binding in an 18 U. S. C. §3582(c)(2) proceeding.

It is useful to put *Booker* in context. During the deliberations that led to the enactment of the Sentencing Reform Act of 1984, 18 U. S. C. §3551 *et seq.*, 28 U. S. C. §991, *et seq.*, Congress considered—and rejected—a proposal that would have made the Guidelines only advisory. See *Mistretta* v. *United States*, 488 U. S. 361, 387 (1989). Ultimately, the decision to authorize the Commission to issue rules that "have the force and effect of laws" generated a serious debate over the constitutionality of the Commission itself. See *id.,* at 413 (SCALIA, J., dissenting).

While we resolved that constitutional debate in the Commission's favor in *Mistretta*, it became apparent during the next two decades that the mandatory character of the Guidelines, coupled with the practice of judicial fact-finding, not only produced a host of excessively severe sentences but also created an unacceptable risk of depriving defendants of long-settled constitutional protections. See, *e.g.*, *Apprendi* v. *New Jersey*, 530 U. S. 466, 490 (2000) (holding that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt"); *Ring* v. *Arizona*, 536 U. S. 584, 602 (2002) (holding that "[i]f a State makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact—no matter how the State labels it—must be found by a jury beyond a reasonable doubt"); *Blakely* v. *Washington*, 542 U. S. 296, 304 (2004) (holding that "[w]hen a judge inflicts punishment that the jury's verdict alone does not allow, the jury has not found all the facts 'which the law makes essential to the punishment,' and the judge exceeds his proper authority" (citation omitted)).

Over a series of cases, we arrived at our present understanding of determinate sentencing schemes: They are constitutionally infirm if they mandate enhanced punishments based on facts found only by a judge by a prepon-

derance of the evidence. By restoring the principles out-
lined in landmark cases such as *In re Winship*, 397 U. S.
358 (1970), *Apprendi* and its progeny fundamentally
changed the landscape of modern sentencing law,[3] and in
so doing paved the way for *Booker*.

The *Booker* Court considered whether the Sentencing
Reform Act's mandatory determinate sentencing scheme
infringed the jury-trial right. In the first of two opinions,
we held that the two applications of the Guidelines before
us violated the Sixth Amendment because the sentencing
judge in each case imposed a more severe sentence than
the facts found by the jury warranted. 543 U. S., at 235.
We recognized that if the Guidelines "could be read as
merely advisory provisions that recommended, rather
than required, the selection of particular sentences in
response to differing sets of facts, their use would not
implicate the Sixth Amendment." *Id.,* at 233. But we
rejected such an advisory reading of the Guidelines, as
they then stood. *Id.,* at 234. To satisfy constitutional
guarantees, we explained that any fact that has the effect
of increasing the mandatory range must be "established by
a plea of guilty or . . . must be admitted by the defendant
or proved to a jury beyond a reasonable doubt." *Id.*, at
244. Otherwise, the sentence would violate the Sixth (and
the Fifth) Amendment.

In light of the potential for mandatory Guidelines sen-
tences to violate the Constitution, the Court had to elect
among possible remedies. As I explained in my dissent
from the Court's second *Booker* opinion (the remedial one),
there was no need to find *any* constitutional infirmity in
*any* provision of the Sentencing Reform Act to provide

──────────

[3] See *United States* v. *O'Brien*, 560 U. S. ___, ___, and n. 1 (2010)
(STEVENS, J., concurring) (slip op., at 1–2, and n. 1) (discussing a
significant sentencing policy trend in 1970's and 1980's, involving a
shift to mandatory, determinate sentencing schemes based on judicial
factfinding by a preponderance standard).

relief for the defendants in *Booker*, or to apply the Guidelines in a mandatory fashion in future cases—so long as juries were allowed to decide the factual issues raised by requests for enhanced sentences. See *id.,* at 272–303 (STEVENS, J., dissenting in part). Notwithstanding the fact that the Court *could* have retained the Guidelines' mandatory prescriptive effect in a manner consonant with the jury-trial right, the Court nevertheless adopted a broad remedy that recast the Guidelines in their entirety.

That change did not respond to a determination that the mandatory Guidelines regime itself violated the Sixth Amendment. Neither my opinion for the Court with respect to our constitutional holding, nor JUSTICE BREYER's remedial opinion, contained any such determination. Instead, the Court's decision to make the Guidelines discretionary rested entirely on the majority's judgment that Congress would have preferred that result to either an increase in the jury's role in making factual findings or a decision invalidating the entire regime. *Id.*, at 249. When Congress was wrestling with the Sentencing Reform Act of 1984, it did not foresee *Apprendi*, *Ring*, and *Blakely*. The Court made a policy-based prediction that, were Congress to have had such foresight, it would not have elected—in any respect—a mandatory sentencing regime.

The Court openly acknowledged this methodology:

"In essence, in what follows, we explain both (1) why Congress would likely have preferred the total invalidation of the Act to an Act with the Court's Sixth Amendment requirement engrafted onto it, and (2) why Congress would likely have preferred the excision of some of the Act, namely the Act's mandatory language, to the invalidation of the entire Act. That is to say, in light of today's holding, we compare maintaining the Act as written with jury factfinding added (the dissenters' proposed remedy) to the total invalidation

of the statute, and conclude that Congress would have preferred the latter. We then compare our own remedy to the total invalidation of the statute, and conclude that Congress would have preferred our remedy." 543 U. S., at 249.

Thus, rather than "maintaining the Act as written with jury factfinding added," *ibid.*, the Court opted to alter the Commission's power in a more fundamental way: It did away with a fixed, determinate sentencing regime based on mandatory Guidelines. Henceforth the Commission would guide and advise federal courts in the exercise of their sentencing authority. But the Commission would not bind.

The Court held as follows:

> "We answer the question of remedy by finding the provision of the federal sentencing statute that makes the Guidelines mandatory, 18 U. S. C. §3553(b)(1) (Supp. IV), incompatible with today's constitutional holding. We conclude that this provision must be severed and excised, as must one other statutory section, §3742(e) (2000 ed. and Supp. IV), which depends upon the Guidelines' mandatory nature. So modified, the federal sentencing statute, see Sentencing Reform Act of 1984 (Sentencing Act), as amended, 18 U. S. C. §3551 *et seq.*, 28 U. S. C. §991 *et seq.*, makes the Guidelines effectively advisory. It requires a sentencing court to consider Guidelines ranges, see 18 U.S.C. §3553(a)(4) (Supp. IV), but it permits the court to tailor the sentence in light of other statutory concerns as well, see §3553(a)." *Id.*, at 245–246.

The only fair way to read the *Booker* majority's remedy is that it eliminated the mandatory features of the Guidelines—all of them.[4] It is true that the Court explicitly

---

[4] See also, *e.g.*, *Booker*, 543 U. S., at 246 (opinion for the Court by

severed only two specific statutory sections. But there was not, at the time, even a whisper of a suggestion that any other mandatory provision existed or that any should be preserved.[5]

Were it not clear from the foregoing discussion of *Booker* itself, our post-*Booker* decisions have repeatedly emphasized the completely advisory nature of the Guidelines. See*, e.g.*, *Cunningham* v. *California*, 549 U. S. 270, 286–287 (2007) ("Under the system described in JUSTICE BREYER's opinion for the Court in *Booker*, judges would no longer be tied to the sentencing range indicated in the Guidelines. But they would be obliged to 'take account of' that range along with the sentencing goals Congress enumerated in the [Sentencing Reform Act of 1984] at 18 U. S. C. §3553(a)"); *Rita* v. *United States*, 551 U. S. 338, 351 (2007) ("[T]he sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply"); *Gall* v. *United States*, 552 U. S. 38,

—————

BREYER, J.) ("The other approach, which we now adopt, would (through severance and excision of two provisions) *make the Guidelines system advisory* while maintaining a strong connection between the sentence imposed and the offender's real conduct—a connection important to the increased uniformity of sentencing that Congress intended its Guidelines system to achieve" (emphasis added)); *id.*, at 254 ("Congress would have preferred *no* mandatory system to the system the dissenters envisage"); *id.*, at 264 ("Finally, the Act without its 'mandatory' provision and related language remains consistent with Congress' initial and basic sentencing intent. . . . The system remaining after excision, *while lacking the mandatory features that Congress enacted*, retains other features that help to further these objectives" (emphasis added)); *ibid.* ("The district courts, *while not bound to apply the Guidelines*, must consult those Guidelines and take them into account when sentencing" (emphasis added)).

[5] It seems, however, that at least one additional provision of the Sentencing Reform Act should have been excised, but was not, in order to accomplish the Court's remedy. Section §3742(g)(2), prescribes that the Guidelines are to have binding effect upon a remand for a new sentence in a direct appeal: "The court shall not impose a sentence outside the applicable guidelines range . . . ."

46 (2007) ("As a result of our decision [in *Booker*], the Guidelines are now advisory, and appellate review of sentencing decisions is limited to determining whether they are 'reasonable'"); *Kimbrough* v. *United States*, 552 U. S. 85, 101 (2007) ("In sum, while the statute still requires a court to give respectful consideration to the Guidelines, *Booker* permits the court to tailor the sentence in light of other statutory concerns as well" (internal quotation marks and citation omitted)); *Spears* v. *United States*, 555 U. S. ___, ___ (2009) *(per curiam)* (slip op., at 5) ("[W]e now clarify that district courts are entitled to reject and vary categorically from the crack-cocaine Guidelines based on a policy disagreement with those Guidelines").[6] Our case law is quite clear: The Guidelines no longer have mandatory and binding effect, and the sentencing court may not presume them correct or reasonable when it considers an individual sentencing decision.

In light of this history, the limited nature of the §3582(c)(2) proceeding is beside the point. Nothing turns

———————

[6] See also *Spears*, 555 U. S., at ___ (slip op., at 6) ("[D]istrict courts are entitled to vary from the crack-cocaine guidelines in a mine-run case where there are no 'particular circumstances' that would otherwise justify a variance from the Guidelines' sentencing range"); *Kimbrough*, 552 U. S., at 101 ("The Government acknowledges that the Guidelines 'are now advisory' and that, as a general matter, 'courts may vary [from Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines'"); *id.*, at 113–114 (SCALIA, J., concurring) ("[T]he district court is free to make its own reasonable application of the §3553(a) factors, and to reject (after due consideration) the advice of the Guidelines. If there is any thumb on the scales; if the Guidelines *must* be followed even where the district court's application of the §3553(a) factors is entirely reasonable; then the 'advisory' Guidelines would, over a large expanse of their application, *entitle* the defendant to a lesser sentence *but for* the presence of certain additional facts found by judge rather than jury. This, as we said in *Booker*, would violate the Sixth Amendment"); *Gall*, 552 U. S., at 50 (sentencing court "may not presume that the Guidelines range is reasonable").

on whether the proceeding is best understood as a resentencing or as a sentence modification procedure. Nor is it relevant that Dillon has no right to be present at a proceeding under §3582(c)(2), *ante*, at 9–10, or that a sentence reduction proceeding may not be "constitutionally compelled," *ante*, at 10–11. The Court's general reliance on *Booker* in this case, see *ante*, at 11–12, is odd because the *Booker* Court explained its belief "that Congress would not have authorized a mandatory system in some cases and a nonmandatory system in others," 543 U. S.*,* at 266. Yet, this is precisely the system the Court approves today.

Approaching this case as the *Booker* Court did, one must ask whether it is likely that a fully informed Congress would have created this kind of Commission: one endowed with vast responsibilities for drafting *advisory* Guidelines and policy statements, but also with the tiniest sliver of lawmaking power to tie the hands of a district court's exercise of grace under §3582(c)(2). I think the answer is obvious.

## II

My understanding of the scope of the *Booker* remedy is reinforced by an additional consideration: The Commission's policy statement, to which the Court today allows binding effect, may exceed the scope of the Commission's powers. No one disputes that Congress could have rejected the Court's remedial holding in *Booker* if it so wished. Instead, it is the Commission that has rejected *Booker*'s application to §3582(c)(2), by purporting to give mandatory force to its own policy statement. That action presses the bounds of the authority Congress validly gave the Commission in 1984, for it is not clear that Congress has authorized the Commission to create this type of policy statement or to circumvent a decision such as *Booker* on its own accord.

We have been quite permissive of congressional delega-

tions in our separation-of-powers jurisprudence. "So long
as Congress 'shall lay down by legislative act an intelligi-
ble principle to which the person or body authorized to
[exercise the delegated authority] is directed to conform,
such legislative action is not a forbidden delegation of
legislative power.'" *Mistretta*, 488 U. S., at 372 (quoting *J.
W. Hampton, Jr., & Co.* v. *United States*, 276 U. S. 394,
409 (1928)). Few legislative actions have been found to
offend this principle. 488 U. S., at 373.

More than 20 years ago, the Court upheld the constitu-
tionality of the Commission's work from just such an
attack in *Mistretta*. We took sanctuary then in the fact
that, in enacting the Sentencing Reform Act and creating
the Commission, Congress had "se[t] forth more than
merely an 'intelligible principle' or minimal standard" for
the exercise of the Commission's discretion, and had "'ex-
plain[ed] what the Commission should do and how it
should do it, and se[t] out specific directives to govern
particular situations.'" *Id.*, at 379. To this end, Congress
gave the Commission clear "goals," *id.*, at 374; specified
the "'purposes of sentencing,'" *ibid.;* "prescribed the spe-
cific tool"—"the guidelines system"—the Commission was
to use in its work, *ibid.;* set limits on the appropriate
Guidelines ranges the Commission was to promulgate, *id.*,
at 375; and set forth "seven factors" and "11 factors,"
respectively, to assist the Commission with "its formula-
tion of offense categories" and its establishment of "catego-
ries of defendants" for sentencing purposes, *id.*, at 375–
376.

We explained that "although Congress granted the
Commission substantial discretion in formulating guide-
lines, in actuality it legislated a full hierarchy of punish-
ment—from near maximum imprisonment, to substantial
imprisonment, to some imprisonment, to alternatives—
and stipulated the most important offense and offender
characteristics to place defendants within these catego-

ries." *Id.*, at 377. There was, accordingly, no "concern of encroachment and aggrandizement that has animated our separation-of-powers jurisprudence and aroused our vigilance against the 'hydraulic pressure inherent within each of the separate Branches to exceed the outer limits of its power.'" *Id.*, at 382 (quoting *INS* v. *Chadha*, 462 U. S. 919, 951 (1983)).

JUSTICE SCALIA disagreed. He argued forcefully that Congress' creation of the Commission was itself "a pure delegation of legislative power" and therefore an abuse of separation of powers. 488 U. S., at 420 (dissenting opinion). "Congress' commitment of such broad policy responsibility to any institution," in JUSTICE SCALIA's view, violated a core principle of our governing system: that "basic policy decisions governing society are to be made by the Legislature." *Id.*, at 415.

Although we acknowledged in *Mistretta* that Congress had permissibly granted substantial powers to the Commission to set law and policy on sentencing generally, we had no occasion to consider whether it had spoken with sufficient clarity respecting the Commission's authority to prescribe sentence reductions. That question has now reared its head, and in my view it raises separation-of-powers concerns significantly more difficult than those presented in *Mistretta.*

First, I am doubtful that Congress authorized the type of "policy statement" we find in USSG §1B1.10. Congress instructed the Commission to promulgate "general policy statements regarding application of the guidelines or any other aspect of sentencing or sentence implementation that in the view of the Commission would further the purposes set forth in section 3553(a)(2) of title 18 . . . including the appropriate use of," *inter alia*, various "sentence modification provisions." 28 U. S. C. §994(a)(2). As envisioned by the Sentencing Reform Act, the role of policy statements was merely to inform the judge's exercise of

discretion within an otherwise mandatory Guidelines regime. See S. Rep. No. 98–225, p. 167 (1983) (explaining that the "sentencing judge is required to take the policy statements into account in deciding what sentence to impose," but that departure from a policy statement is not itself grounds for appeal); see also *id.*, at 166 (identifying potential use of policy statement to "offe[r] recommendations as to how" to "trea[t]" "in the future" "existing disparities which are not adequately cured by the guidelines"). Congress reserved binding effect for the Commission's "guidelines," which the Commission was to promulgate pursuant to a distinct statutory provision, §994(a)(1). The Sentencing Reform Act thus drew a basic distinction: Guidelines would bind; policy statements would advise.

Given that distinction, it is significant that Congress elected to use the Commission's policy-statement power to set limitations on the sentencing modification procedures, rather than invoking the Commission's Guidelines power. The Commission is now trying to use a policy statement to have the mandatory effect of a guideline—inverting the Sentencing Reform Act's original design. I find no provision within §994(a)(2) that would authorize the Commission, via a policy statement, to create a binding Guidelines regime. With respect to the type of action the Commission has taken, there is certainly no provision that even approximates the detailed prescriptions on the Commission's power we considered in *Mistretta.*

Moreover, not only does nothing in §994(a)(2) appear to authorize this type of policy statement, but there is also nothing that appears to authorize the Commission, by its own fiat, to limit the effect of our decision in *Booker*.

How to respond to *Booker*, and whether to retain mandatory Guidelines, was a decision for Congress—and Congress alone. *Booker* expressly left "[t]he ball" "in Congress' court," explaining that "[t]he National Legisla-

ture is equipped to devise and install, long term, the sentencing system, compatible with the Constitution, that Congress judges best for the federal system of justice." 543 U. S., at 265; see also *supra*, at 3–4. That Congress has declined to disturb *Booker* in the five years since its issuance demonstrates not only that JUSTICE BREYER is more clairvoyant than I am, but also that Congress has acquiesced to a discretionary Guidelines regime. Congress' silence has deprived the Commission of any "intelligible principle[s]," *J. W. Hampton*, 276 U. S., at 409, by which to steer its consideration of the appropriate response to *Booker*. And without such guidance, I fear that, in promulgating USSG §1B1.10, the Commission may have made the type of "basic policy decisio[n]" that JUSTICE SCALIA reminded us is the province of the Legislature, *Mistretta*, 488 U. S., at 415 (dissenting opinion).

Prior to the Commission's 2008 overhaul of its policy statement in §1B1.10—and even under the applicable policy statement in effect when the Court decided *Booker*—nothing in the Guidelines, see *supra*, at 3–4, and n. 2, as understood in light of *Booker*, would have precluded Dillon from obtaining the type of discretionary sentence reduction he now seeks (assuming he was so eligible). Standing in Dillon's way presently are two provisions of §1B1.10, revised contemporaneously with the Commission's decision to make its amendments to the crack cocaine offense Guidelines retroactive.

There can be no question that the purpose of the Commission's amendments to its policy statement in §1B1.10 was to circumvent the *Booker* remedy. See Brief for Federal Public and Community Defenders et al. as *Amici Curiae* 3–9 (describing history of promulgation of current version of §1B1.10). To this end, the Commission disclaimed that proceedings under §3582(c)(2) "constitute a full resentencing of the defendant." USSG §1B1.10(a)(3). And it advised that "the court shall not reduce the defen-

dant's term of imprisonment under 18 U. S. C. §3582(c)(2) and this policy statement to a term that is less than the minimum of the amended guideline range determined" under the new range. §1B1.10(b)(2)(A). In other words, the Commission told federal courts that its Guidelines, at least in §3582(c)(2) proceedings, remain mandatory and binding.

Had the Commission taken it upon itself, by issuance of a general policy statement, to make its Guidelines mandatory but subject to jury findings in all cases, we would either strike down such an act on separation-of-powers grounds or apply the same remedy we did in *Booker* to render the statement advisory. It makes little difference, in my view, that the Commission has only rejected the *Booker* remedy in this single procedure. The encroachment is the same, if only more subtle. Any legislative response to *Booker* was a decision for Congress to make—not the Commission.

## III

Separate from the arguments noted above, the Court's decision today may reflect a concern that a contrary holding would discourage the Commission from issuing retroactive amendments to the Guidelines, owing to a fear of burdening the district courts. In what might be described as a subtle threat, the Commission has highlighted this point in its *amicus* brief supporting the Government. The brief explains that holding for Dillon would introduce uncertainty into the Commission's "assessments about the effects of retroactivity decisions," making these decisions "very difficult" and "weigh[ing] against making Guideline amendments retroactive in the future." Brief for United States Sentencing Commission as *Amicus Curiae* 21.[7]

───────────

[7] The Government's argument along these lines is less subtle: "To forbid the Sentencing Commission from limiting the scope of Section 3582(c)(2) sentence reduction proceedings to the scope of the amend-

Even if that explanation were accurate, it should not influence our assessment of the legal question before us. The Commission has a statutory obligation to review and amend Guidelines ranges. 28 U. S. C. §994(*o*). And Congress has commanded that the Commission "shall specify in what circumstances" an amendment is retroactive, indicating that most, if not all, substantial amendments are to receive some type of retroactive effect. §994(u); see also S. Rep. No. 98–225, at 180 ("It should be noted that the Committee does not expect that the Commission will recommend adjusting existing sentences under [§3582(c)(2)] when guidelines are simply refined in a way that might cause isolated instances of existing sentences falling above the old guidelines or when there is only a minor downward adjustment in the guidelines"). In other words, while Congress has left the retroactivity decision to the Commission's discretion, it has done so with the presumption that some form of retroactive relief is appropriate when a Guidelines amendment is nontrivial.[8] I cannot

––––––––––

ments themselves would inevitably discourage the Sentencing Commission from ever authorizing sentence reductions." Brief for United States 37.

[8] As the Court notes, I do agree that §994(u) authorizes the Commission to determine the retroactive effect of sentence reductions. *Ante*, at 13. I understand §994(u) as directing the Commission to prescribe the retroactive effect, if any, of its Guidelines amendments. The power to make retroactivity determinations is meaningfully different, however, from the other power the Court claims for the Commission. In granting the former power, Congress has instructed the Commission to perform a gate keeping function by determining which individuals are eligible for relief pursuant to §3582(c)(2). By contrast, the other power the Court claims for the Commission today is the type of mandatory sentencing authority at issue in *Booker*. Contrary to the Court's conclusion, the Commission after *Booker* does not have the power to bind the district court in setting a particular sentence.

I also cannot accept the Court's broad understanding of the power the Commission derives from §994(u), see *ante*, at 8, because it suffers from the same delegation concerns I discussed above, see *supra*, 11–16.

accept that the Commission would ignore its obligations, and would withhold retroactive application of a Guidelines reduction, simply because a judge would have discretion to enter a below-Guidelines sentence in a §3582(c)(2) proceeding.

Undoubtedly, discretionary application of the Guidelines in §3582(c)(2) proceedings would impose a greater burden on the district courts. Such a process would require case-specific evaluations rather than the rote, two-level reductions the Commission envisioned when it made Amendment 706 retroactive. But it is important to remember that §3582(c)(2) already requires the district court to consider the §3553(a) factors when it determines whether to grant a reduction, as well as the extent of the reduction. And any additional consideration of evidence proffered to justify a downward departure need not create a great deal of work. Indeed, it need not create any particular adversarial process at all: The Commission could simply advise the district courts to review paper submissions, including the original presentence report and objections, as well as any new submissions. By now, courts are intimately familiar with our post-*Booker* sentencing regime and the discretionary application of the §3553(a) factors.

The facts of Dillon's case show why any additional burden on the courts caused by applying *Booker*'s remedial holding likely pales in comparison to the benefit of achieving more tailored, proportionate sentences for those individuals currently serving terms of imprisonment that exceed what is "necessary" to meet the goals of our sentencing system, §3553(a). Dillon was 23 years old when he was sentenced to nearly 27 years' imprisonment for his

_____

I do not think the Commission's authority encompasses the ability to promulgate binding Guidelines via policy statements. And this matter is separate from its power to promulgate Guidelines—a power unaffected by our decision in *Booker*.

drug crimes. His attorney urged the District Court to enter a below-Guidelines sentence because of, *inter alia*, the gross disparity between sentences for crack and powder cocaine offenses. App. 8–9. It would take another 14 years for this Court to agree, finally, in *Kimbrough*, 552 U. S. 85, that sentencing courts could consider this unjust disparity.

But the District Court, constrained by the then-mandatory Guidelines, increased Dillon's sentence based on judge-found facts by more than 10 years over the sentence authorized by the jury's verdict. See Brief for Petitioner 2, and n. 2. The court could only lament: "I personally don't believe that you should be serving 322 months. But I feel I am bound by those Guidelines and I don't feel there is any grounds for . . . depart[ing] from those Guidelines." App. 12–13. The court acknowledged: "I don't say to you that these penalties are fair. I don't think they are fair." *Id.*, at 13. The court also implored Dillon to make something of the hand he had dealt himself: "I hope that while you are in prison . . . that you will take some time to consider the direction that your life will take when you do return to society. . . . It is only through people like you if you spread the word that other young men of your age will hesitate to get involved in [dealing drugs]." *Ibid.*

Dillon has done just that. He has participated in outreach efforts in the communities in which he has been imprisoned, doing extensive work with adolescents to steer them away from a life of drugs and crime. Brief for Petitioner 5–6. Working with two universities, he has facilitated the initiation of an African-American Studies program at Hunters Point Family, a Bay Area organization devoted to assisting at-risk youth. He has also played a large role in initiating a similar program at his prison facility. Berkeley's Prison Outreach Coordinator stated to the District Court that "without [Dillon's] insight and advice, our project would not have succeeded and grown

the way it has." *Id.*, at 6 (internal quotation marks omitted). Dillon has also prepared himself for a successful life once he returns to society. He has obtained his general equivalency diploma (GED), taken vocational classes in property management, and has job prospects awaiting him upon release. *Id.*, at 6–7.

The Government concedes that Dillon has undertaken "significant institutional rehabilitation and education." Brief for United States 11. The Court of Appeals acknowledged that "[i]f *Booker* did apply in proceedings pursuant to §3582, Dillon would likely be an ideal candidate for a non-Guidelines sentence." 572 F. 3d 146, 147 (CA3 2009). And yet, now, the Government will continue to spend more than $25,000 a year to keep Dillon behind bars until his release date.[9]

Given the circumstances of his case, I can scarcely think of a greater waste of this Nation's precious resources. Cf. *Barber* v. *Thomas*, *ante*, at ___ (2010) (slip op., at 1) (KENNEDY, J., dissenting) ("And if the only way to call attention to the human implications of this case is to speak in terms of economics, then it should be noted that the Court's interpretation comes at a cost to the taxpayers of untold millions of dollars"). Dillon's continued imprisonment is a truly sad example of what I have come to view as an exceptionally, and often mindlessly, harsh federal punishment scheme.

## IV

Neither the interests of justice nor common sense lends any support to the decision to preserve the single sliver of the Commission's lawmaking power that the Court resur-

---

[9] See Hanlon, Hecker, & Gopstein, Expanding the Zones: A Modest Proposal to Increase the Use of Alternatives to Incarceration in Federal Sentencing, 24 ABA Criminal Justice, No. 4, pp. 26, 28 (Winter 2010) ("In fiscal year 2008, it cost $25,894.50 to incarcerate an offender in a federal Bureau of Prisons facility for 12 months").

rects today.  I had thought *Booker* dismantled the mandatory Guidelines regime.  The Court ought to finish the job.

I respectfully dissent.